IN THE DISTRICT COURT OF APPEAL
FIRST DISTRICT, STATE OF FLORIDA

DEANDRE ROSS,

     Appellant,

v.

STATE OF FLORIDA,

     Appellee.

_____/

NOT FINAL UNTIL TIME EXPIRES TO
FILE MOTION FOR REHEARING AND
DISPOSITION THEREOF IF FILED

CASE NO. 1D13-4401

Opinion filed February 3, 2015.

An appeal from the Circuit Court for Leon County.
James C. Hankinson, Judge.

Melissa Joy Ford, Assistant Conflict Counsel, Office of Criminal Conflict and Civil Regional Counsel, Region One, Tallahassee, for Appellant.

Pamela Jo Bondi, Attorney General, and Jennifer J. Moore, Assistant Attorney General, Tallahassee, for Appellee.

WOLF, J.

Appellant challenges his convictions for attempted second-degree murder and shooting at, within, or into an occupied vehicle. He raises several issues, one of which we find has merit and requires reversal. We determine that pursuant to Floyd v. State, 39 Fla. L. Weekly D1800 (Fla. 1st DCA Aug. 26, 2014), the trial

court committed fundamental error in giving contradictory instructions on the duty to retreat, thereby negating the possible application to appellant's only defense.

## Facts

Samuel Paramore, appellant's friend and housemate, testified that he was at a party with his cousin and appellant when his fiancé called and told them to come home. When they arrived home, he discovered his house had been broken into. He returned to his car because he had noticed a suspicious truck when he drove into the neighborhood.

Paramore was driving towards the front of the neighborhood when he saw the truck again, so he followed it. When the truck turned around in a cul-de-sac, Paramore let down his window and motioned to the driver because he thought the driver may have been involved in the burglary. The other driver did not stop, but drove on towards the exit out of the neighborhood.

Paramore further testified that as the suspicious truck was about to pass his driveway, his cousin and appellant stepped into the roadway, and appellant also tried to wave down the vehicle to see who was in it. The truck initially slowed down, but just as it came directly in front of appellant, the driver hit the horn and the gas. Appellant jumped back, barely avoiding being struck by the truck. Paramore saw appellant fire one shot.

Appellant's statement to the police, which was admitted at trial, was generally consistent with Paramore's testimony. He stated when he arrived home, the door was open and broken glass was everywhere. He saw that his gun safe was missing. He then retrieved a 9 millimeter handgun – his only gun that had not been in the safe – and began walking around the house to ensure no one was there. As Paramore's fiancé was calling the police, appellant noticed the truck drive down to the end of the road and go around the cul-de-sac. He wondered if the truck had been involved in the burglary. As the truck drove back up the street towards his house, he stepped into the street "waving, like help, did anybody see anything." He stated he was "trying to . . . stand in front of the truck. . . . waving at the truck. And the truck tried to run me over." The driver suddenly stepped on the gas, and he heard the engine rev. He further stated "as the truck tried to run me over, I backed up and I tried to defend myself" by shooting at it. He began shooting as he fell back into the driveway, and he continued to shoot as he got up. He further stated he was shooting at a downward trajectory, trying not to hit the glass. Neither the testimony of the police nor the physical evidence directly contradicts appellant's version of the event.

Investigator Michael Trowbridge, who was driving the truck on which appellant fired, stated on the night in question, he was conducting surveillance related to a string of burglaries in an unmarked truck with dark-tinted windows.

Although he was wearing a vest that said "police" across the chest, because he was wearing a jacket and the windows were dark, he did not believe a passerby would have been able to tell he was an officer. Trowbridge testified he was in a parking lot that abutted the back side of a residential fence when he heard suspicious noises coming from the other side of the fence. He stated he decided to drive through the neighborhood to investigate. As he drove down the residential street, he saw a silver car sitting up on the curb, facing a home on the left-hand side of the road. The engine was running, the car doors were all standing open, and the dome lights were on. He stated he did not see anyone. He drove by the car to the end of the road, turned around in the cul-de-sac, and started driving back up the road. A second silver car then pulled up on his driver's side. The driver rolled down the window and "made a motion with his hand" indicating he wanted Trowbridge to stop. Trowbridge testified he decided not to stop because he did not know whether the driver of the second car was connected with the abandoned car or the burglary investigation. He stated if he stopped, he would have to identify himself as an officer and potentially blow the investigation. So, he drove on without stopping and exited the neighborhood.

He realized that he had forgotten to get the tag number of the abandoned car, so he turned around and went back. He stated that when he drove back down the road, he saw two young men in the vicinity of the abandoned car, standing on

4

opposite sides of the road. He drove past the car and got the tag number, but then he had to do another U-turn in the cul-de-sac. As he approached the cul-de-sac, he realized the second car was behind him and also turning around. He made the U-turn in the cul-de-sac and headed back up the street. As he approached the abandoned car, the two men who had been standing on opposite sides of the street walked towards the middle of the street. He stated he became concerned that they were moving into a "tactical position" by "flanking" him as a SWAT team would. He further stated he felt he was in a vulnerable position, with the two men ahead of him and the driver behind him, so he intended to drive on by. However, he stated the man on the right-hand side of the road "stepped in front of my moving vehicle and waved his hands in a manner that indicated to me that he was stopping me." He feared he was being "ambushed," so he "quickly jerked the wheel and accelerated probably almost at the exact same time." He testified the man in front of him moved away rapidly and took a pistol out of his waistband. As he drove away, he heard gunshots and felt glass hitting his face. He further stated he later realized that his vehicle was hit by gunfire on both the right and left sides.

As he accelerated, he lost sight of appellant and then "immediately after that he heard gunshots."

The crime scene unit found twenty-five shell casings in the area, and nine projectile fragments were taken from Trowbridge's car.

A reconstructionist officer testified that there were bullets fired into both sides of the truck, from which he concluded there must have been two shooters. His testimony is somewhat difficult to follow because he relied heavily on demonstrative aids that do not appear in the record. It appears, however, appellant fired the shots that hit the passenger side of the truck. He testified the first shot entered the front passenger door. He testified it was shot at a "left horizontal angle of 60 degrees," meaning "if you're standing there looking at the passenger side of the vehicle, that means that the trajectory of the bullet came from your left." He stated that he marked on his demonstrative aid the location where the shooter was standing, but as noted above, those aids do not appear in the record. He testified the second shot hit the rear passenger window, and it was also at a trajectory of "a left horizontal angle of 60 degrees." The third shot went through the passenger window and entered the dash. It was shot from a "left horizontal angle of 29.6 degrees." There were also shots fired into the back of the truck, but because those shots came from the rear of the vehicle, he testified they "could have been shot by either one of the two shooters."

Appellant raised self-defense as his sole defense. The jury was given the standard instruction on justifiable use of deadly force. See Fla. St. Cr. Jury Instruct. 3.6(f).

Appellant argues the jury instruction constituted fundamental error because it gave conflicting instructions on the duty to retreat.

We find the instant case is materially indistinguishable from Floyd v. State, 39 Fla. L. Weekly D1800 (Fla. 1st DCA Aug. 26, 2014). The jury in Floyd, like the jury in the instant case, was instructed that "the deadly use of force is not justifiable if you find: [the defendant] **initially provoked the use of force against himself**, unless [:] . . . [he] had **exhausted every reasonable means to escape the danger other than using deadly force**." Floyd at D1800. The jury was also instructed that "[i]f the defendant was not engaged in unlawful activity and was attacked in any place where he had a right to be, **he had no duty to retreat and had the right to stand his ground and meet force with force, including deadly force** . . . ." Id.

The Floyd court explained this instruction was conflicting because the stand-your-ground provision stated the defendant had no duty to retreat so long as he was not engaged in unlawful activity; however, the "aggressor" portion stated he had a duty to retreat if he provoked. Thus, the instruction stated the defendant "did not have to retreat . . . *and* did have a duty to retreat before using deadly force." Id. at D1801. The court concluded the "conflicting jury instructions negated each other in their effect, and therefore negated their possible application to Floyd's only

7

defense" – self-defense pursuant to the stand-your-ground law. Id. Floyd claimed that he opened fire because someone else fired first; however, the State presented evidence that Floyd fired first. Id. at D1800.[*] Because the instruction negated Floyd's sole defense, this court concluded the instruction was fundamental error. Id. at D1801.

Here, as in Floyd, the conflicting instruction negates appellant's only theory of defense. Below, the sole defense raised by appellant's counsel was that appellant had the right to stand his ground and defend himself. However, the State argued to the jury that appellant provoked Investigator Trowbridge by stepping in

---

[*] The confusing instructions are derived from sections 776.013(3), Florida Statutes (2012), and 776.041(2), Florida Statutes (2012), which state:

> A person who is not engaged in an unlawful activity and who is attacked in any other place where he or she has a right to be has no duty to retreat and has the right to stand his or her ground and meet force with force, including deadly force if he or she reasonably believes it is necessary to do so to prevent death or great bodily harm to himself or herself or another or to prevent the commission of a forcible felony.

§ 776.013(3), Fla. Stat. (2012).

> The justification described in the preceding sections of this chapter is not available to a person who: Initially provokes the use of force against himself or herself, . . . .

§ 776.041(2), Fla. Stat. (2012).

We suggest both the Legislature and the Florida Supreme Court address the problem to avoid the necessity of future retrials.

front of his truck, so appellant had a duty to retreat. Thus, appellant argues that here, as in Floyd, the conflicting instruction negated his theory of defense. Appellant is correct.

If the evidence had conclusively demonstrated that appellant continued to fire at the truck after it passed him by, then arguably self-defense would not truly have been at issue in this case, despite the fact that appellant raised that as his sole defense. However, although a close issue, the evidence did not completely foreclose the possibility that all of the shots fired by appellant were fired as the truck was still coming at him.

Therefore, because the evidence in this case did not conclusively refute appellant's claim that he fired in self-defense, we find the case indistinguishable from Floyd. As such, we REVERSE.

ROWE and OSTERHAUS, JJ., CONCUR.